# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MARCUS ROARK,
       Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
       Defendant

Case No. 1:10-cv-739
Barrett, J.
Litkovitz, M.J.

REPORT AND
RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for Supplemental Security Income (SSI). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 11), the Commissioner's response in opposition (Doc. 16), and plaintiff's reply

memorandum. (Doc. 19).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1949 and was 57 years old on the date he filed his SSI application.

He is a Vietnam veteran with at least a high school education and no past relevant work

experience. (Tr. 98, 102-03, 108, 111). Plaintiff received SSI from 1987 to 2004, when his

benefits were terminated.[1] (Tr. 20). In December of 2005, plaintiff was incarcerated for a drug

possession charge and his SSI benefits were discontinued. (Tr. 201-58, 259). Plaintiff filed an

SSI application with a protective filing date of April 26, 2006, alleging a disability onset date of

---

[1] Plaintiff alleges in the Statement of Errors that he received SSI until 2005 (Doc. 11 at 2, citing Tr. 125, 183, 259), and that his benefits were terminated in November 2005 when he was jailed on a drug possession charge. (*Id.* at 2). However, the documents plaintiff cites do not establish that he stopped receiving SSI benefits in November of 2005. Rather, those documents indicate that he reported to an examining psychologist that he received SSI from 1987 to 2004 (Tr. 259); plaintiff's niece reported that he got into legal trouble in June 2004 and he stopped receiving SSI in May 2005 because of a warrant for his arrest (Tr. 183-184); and no dates concerning the receipt of benefits are provided at Tr. 125.

February 1, 1987, due to a neurotic disorder. (Tr. 96-101, 107). The application was denied initially and upon reconsideration. Plaintiff then requested and was granted a de novo hearing before Administrative Law Judge (ALJ) Robert Flynn. (Tr. 71-77). Plaintiff, who was represented by counsel, appeared at the hearing. (Tr. 30-51). A vocational expert (VE) also appeared and testified at the hearing. (Tr. 51-59).

On January 28, 2009, the ALJ issued a decision denying plaintiff's SSI application. (Tr. 12-25). The ALJ determined that plaintiff suffers from the severe impairments of post-traumatic stress disorder, dysthymia, polysubstance abuse in partial remission, right inguinal hernia, and hepatitis C. (Tr. 17). The ALJ concluded that plaintiff does not have an impairment or combination of impairments that meet or equal the requirements of any section of 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). (Id.). The ALJ specifically found that plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04, 12.06, and 12.09. (Id.).

The ALJ determined that plaintiff retains the residual functional capacity (RFC) to perform medium exertional work as defined in 20 C.F.R. § 416.967(c) except that he can frequently climb ladders, ropes, or scaffolds; frequently climb ramps or stairs; and frequently balance, stoop, crouch, kneel, and crawl. He must wear a truss while performing exertional work. He can perform simple, routine, and repetitive tasks. He requires a low stress environment free of fast paced production requirements and involving only simple, work-related decisions and few, if any, workplace changes. His work must be isolated with only occasional supervision, and he requires an alcohol and drug-free environment. (Tr. 18). The ALJ found that plaintiff's medically determinable impairment could reasonably be expected to cause the alleged

2

symptoms; however, plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with plaintiff's RFC. (Tr. 19). The ALJ determined that plaintiff has no past relevant work. (Tr. 24). Using § 204.00 of the Medical-Vocational Guidelines as a framework for decisionmaking, and relying on the testimony of the VE, the ALJ determined that there are jobs that exist in significant numbers in the national economy that plaintiff could perform given the RFC to perform a limited range of medium work. (Tr. 24-25). Consequently, the ALJ concluded that plaintiff is not disabled under the Social Security Act and therefore not entitled to SSI. (Tr. 25).

The Appeals Council denied plaintiff's request for review, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon

disability, income, and other financial resources. 20 C.F.R. § 416.202.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments. An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Sec'y of HHS*, 773 F.2d 85, 90 (6th Cir. 1985) (citation omitted). *See also Bowen v. Yuckert*, 482 U.S. 137 (1987). If the individual does not have a severe impairment, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listings set forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). Plaintiff's impairment need not precisely meet the criteria of the Listings in order to obtain benefits. It is sufficient if the impairment is medically equivalent to one in the Listings. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b). If the

4

impairment meets or equals any in the Listings, the Commissioner renders a finding of disability without consideration of the individual's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981). Fourth, if the individual's impairments do not meet or equal any in the Listings, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1053 (6th Cir. 1983); *Kirk*, 667 F.2d at 529.

Plaintiff has the burden of proof at the first four steps of the sequential evaluation process. *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *Wilson*, 378 F.3d at 548. *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut

plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson*, 378 F.3d at 548.

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three. 20 C.F.R. § 416.920a. At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Rabbers v. Commissioner Social Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520a(b)(1)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)).

At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* A claimant whose impairment meets the requirements of the Listings will be deemed conclusively disabled. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*,

127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); *see also Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). *See also* 20 C.F.R. § 404.1527(d)(2).

The opinion of an examining source is generally entitled to more weight than the opinion of a source who has not examined the claimant. *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). The weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(d)(3).

# MEDICAL RECORD

## I. Psychological evidence

The record contains treatments records from the Veteran's Administration (VA) dated October 2005 to September 2008. (Tr. 277-326, 357-75, 376-97). The records reflect that plaintiff served in the United States Army during the Vietnam War and received an honorable discharge in 1972 with a 30% disability rating for post traumatic stress disorder (PTSD). Plaintiff underwent mental health screening at the VA in October 2005 after he was ordered to undergo treatment by his court probation officer for cocaine possession. The report notes that plaintiff had two cocaine possession charges within the past six months, with the second one violating his probation. He reported to the social worker he had been using crack cocaine; he often used cannabis and had last used it two days ago; and he infrequently used IV heroin and had last used it six weeks ago. Plaintiff reported as part of the substance dependence admission screen that his drugs of choice were cocaine and cannabis; he had last used crack eight days ago; and he used cannabis four times a month and had last used it eight days earlier. Karen Ross, R.N., who completed the mental health screening intake summary, diagnosed plaintiff with PTSD, THC dependency, and cocaine dependency, and she assigned him a Global Assessment of Functioning (GAF) score of 40.[2] (Tr. 317-320).

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with GAF scores of 31 to 40 as having "some impairment in reality testing, or impairment in speech and communication, or serious impairment in several of the following: occupational or school functioning, interpersonal relationships, judgment, thinking or mood. *Id.* at 32.

On October 13, 2005, plaintiff was evaluated at the VA by psychiatric resident Jeffrey R. Strawn, M.D., during a 40-minute session. (Tr. 308-310). Plaintiff reported a history of cocaine abuse dating to 2001, with his most recent use occurring approximately two to three weeks earlier. Plaintiff complained of suicidal thoughts, distractibility, irritability, anxiety, insomnia, and a significantly depressed mood since 2001 contextually related to a number of psychosocial stressors. He had a number of intrusive and hyperarousal type symptoms, moderate psychomotor retardation, and decreased rate of speech. Thought processes were linear and goal-directed, logic was concrete, and plaintiff displayed no perceptual abnormalities. Cognitively, plaintiff was alert and oriented. Plaintiff was diagnosed with PTSD; adjustment disorder with depressed mood; marijuana abuse; and cocaine abuse. He was assigned a GAF score of 50.[3] (Tr. 308-310).

Norman Berg, Ph.D., a psychological medical consultant, examined plaintiff on July 31, 2006. Plaintiff reported that he received SSI benefits from 1987 to 2004. He was arrested for drug possession in June 2004; he served four months in jail; and he was released from prison in April 2006. Plaintiff reported that he had restless sleep because of flashbacks; flashbacks four to five days per week; crying spells; depression; difficulty with concentration; and social withdrawal associated with time served in Vietnam. His daily activities included some cooking, cleaning and laundry, and shopping. He was able to wash, dress and attend to his personal hygiene. Plaintiff reported that he had not used cocaine in over two years; he occasionally used marijuana and had last smoked it a couple of days before the evaluation; he occasionally took Valium; and he not drunk alcohol in 12 years. Plaintiff's speech was relevant and coherent, but

---

[3]The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms; *e.g.*, suicidal ideation, or any serious impairment in social, occupational or school functioning (*e.g.*, no friends or unable to keep a job). *Id.*

9

at times he was circumstantial and tangential. Clinically, plaintiff appeared to be of average intelligence. There was no evidence of psychotic processes. According to Dr. Berg, plaintiff appeared anxious to a moderate to moderately severe degree and moderately depressed. He exhibited features of PTSD related to Vietnam. Memory processes appeared satisfactory. Plaintiff seemed preoccupied with thoughts of how the government had not been fair to him or other Vietnam era veterans. Dr. Berg diagnosed plaintiff with PTSD; depressive disorder of moderate severity; and marijuana and Valium abuse. Dr. Berg assigned a GAF score of 50. Dr. Berg opined that plaintiff would have no limitations in his ability to understand, remember and follow simple instructions in a work setting; he would have moderate limitations in his ability to maintain attention and concentration while doing work-related tasks; he would have moderate limitations in his ability to relate adequately to others in a work setting; he would have moderately severe to marked limitations in his ability to sustain his level of activity in a work setting; and he would have "extreme limitations at this time" in his ability to cope with routine job stress. (Tr. 264). Dr. Berg felt that plaintiff's present abuse of substances was not significantly interfering with his overall level of functioning. (Tr. 259-65).

In August 2006, a state agency psychologist, Dr. William Benninger, Ph.D., reviewed the file and completed a Psychiatric Review Technique and a mental RFC assessment. In the Psychiatric Review Technique, Dr. Benninger opined that plaintiff had mild restrictions in the activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (Tr. 330-343). In the mental RFC assessment, Dr. Benninger opined that plaintiff was moderately limited in his ability to perform the following functions: maintain

attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 344-345). Dr. Benninger found plaintiff could perform simple three to four step tasks; he was precluded from working with the general public; he would work best alone in an environment that does not have frequent changes or strict production standards; and he could handle a work environment with routine stress. (Tr. 346).

Dr. Aracelis Rivera, Psy.D., a state agency reviewing psychologist, affirmed Dr. Benninger's assessment as written in February 2007. (Tr. 328).

Dr. Tobias C. Weiss, Psy.D., of the VA performed a 27-minute psychological evaluation by telephone on July 24, 2008, in conjunction with a consult to the PTSD and Anxiety Disorders program of the VA. Dr. Weiss reported that plaintiff was depressed but was not a current risk of suicide. (Tr. 392-397).

On September 5, 2008, psychologist David Greenwald at the VA evaluated plaintiff and completed a mental health intake summary. Plaintiff stated that he was at the VA because he needed to get further treatment for his PTSD and he needed "to be reverified for his PTSD" in order "to get SSI started again." (Tr. 378). Plaintiff denied any difficulties with daily activities. Plaintiff reported feelings of worry, guilt, despair, fear, anxiety, hopelessness, and sadness. He

11

complained of difficulty sleeping. Plaintiff was friendly and cooperative; his speech was goal-directed; his affect was congruent and appropriate; and his thought form was relevant and logical. Plaintiff's mood was depressed, and he was mildly anxious. Plaintiff had occasional passive suicidal ideation with no plan or intent. Scores from the Post-Traumatic Cognitions Inventory (PTCI) indicated that plaintiff suffered from a moderate level of maladaptive cognitions related to various behaviors. Dr. Greenwald assigned plaintiff a GAF score of 50. Dr. Greenwald noted in an addendum that plaintiff's index trauma was witnessing a friend being killed in combat while plaintiff and the friend were standing together. Dr. Greenwald opined that although plaintiff's score on the Beck Depression Inventory II (BDI-II) showed that plaintiff was experiencing a severe level of depression, it appeared the test results "reflect[ed] spurious elevation." (Tr. 390). Dr. Greenwald reached the same conclusion as to the PCL test for PTSD, which showed plaintiff endorsed clinically-significant levels of symptoms associated with PTSD. (Tr. 378-91).

## II. Physical evidence

On October 6, 2005, plaintiff presented to the urgent care department at the VA with a very large but non-painful inguino-scrotal hernia. Plaintiff reported that the hernia was uncomfortable "due to size and difficulty in being able to void without wetting self given size of the scrotum." (Tr. 284). Plaintiff was initially referred to general surgery for a consultation, but the consultation was discontinued due to plaintiff's use of substances eight days earlier, to be submitted again after 30 days "clean time" or following a residential rehabilitation program. (*Id.*).

A VA report dated October 13, 2005, noted that plaintiff presented to the emergency

12

room three times in the week following the initial consultation with discomfort. He claimed his hernia got bigger during the day as he moved about, and it caused him a significant amount of discomfort. Plaintiff reported that he drank alcohol occasionally. He claimed that he had been cocaine and marijuana free since March of that year. Plaintiff expressed a desire to have the hernia repaired, and he was scheduled for pre-admission to be followed by surgery on October 17, 2005. The report noted that given plaintiff's history of cocaine abuse, he would require a drug screen that same day and the day of the surgery. Plaintiff's medications at that time included Sertraline for depression/mood and Trazodone. (Tr. 285-289).

Plaintiff's surgery was cancelled after he failed to report for pre-admission testing. It was noted that he could possibly be referred again after he obtained a primary care provider. (Tr. 285, 308).

Plaintiff was incarcerated in January 2006 for cocaine possession. While incarcerated, plaintiff tested positive for hepatitis C. (Tr. 368).

Following his incarceration, plaintiff sought emergency room treatment at the VA in September 21, 2006. Plaintiff complained of pain when walking long distances, throbbing pain in the right testicle after exercise, and pain which often interfered with his sleep. Plaintiff described the pain as chronic and reported that only lying still alleviated the pain. He did not complain of any issues with urination. Plaintiff reported he had been scheduled for surgical repair of the hernia until he had some legal issues which prevented him from having the surgery performed. Plaintiff again sought a referral to general surgery. (Tr. 304-306).

Consultative examining physician Jennifer Wisher Bailey, M.D., examined plaintiff in September 2006. Plaintiff complained of sharp pain radiating from his groin to his scrotum,

13

which was aggravated by prolonged ambulation. Plaintiff reported frequent marijuana use and illicit Valium use. Dr. Bailey reported a large mass extending from the right groin/inguinal area to the right scrotum. Dr. Bailey diagnosed an inguinal hernia, exogenous obesity, ongoing polysubstance abuse, and hepatitis C. Dr. Bailey opined that based on her examination findings, plaintiff appeared capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects. In addition, she opined that he has no difficulty reaching, grasping, and handling objects. She found no visual and/or communication limitations nor any environmental limitations. Dr. Bailey concluded that until such time as the hernia was repaired, plaintiff should probably wear a truss while performing work activities. (Tr. 267-76).

Plaintiff presented to the emergency room at the VA on November 28, 2006, seeking pain medications for his hernia. Plaintiff stated he had not been able to keep an appointment with a primary care physician because of transportation issues. The report notes that when it was explained to plaintiff that the VA would get lab results and x-rays of his abdomen and refer him to general surgery and a primary care provider, plaintiff indicated he just wanted his pain medications; he got verbally abusive; and he left. (Tr. 302-303).

In June 2007, primary care physician Dr. Melinda Somoza, M.D., examined plaintiff. Plaintiff complained that his hernia had been growing larger and was quite painful. Dr. Somoza opined that he needed surgery and prescribed Vicodin for the pain. Dr. Somoza noted that plaintiff used to take Zoloft and Trazadone but he did not feel they were helpful. (Tr. 368-369).

Dr. Somoza consulted with plaintiff over the telephone in September 2007. She indicated that plaintiff had not made arrangements for hernia surgery, stating that he was busy with other

14

things. Dr. Somoza informed plaintiff that she was not willing to give him any more pain medication refills unless he came in for an evaluation. Plaintiff's niece called to request a Vicodin refill for him on November 15, 2007. She was informed plaintiff would need to schedule an appointment to get his pain medication. (Tr. 370-373).

## WITNESS STATEMENTS

Jackie KaKaris, plaintiff's niece, wrote letters to the Commissioner dated November 15, 2006, and April 11, 2007. She reported that after returning from the Vietnam War, plaintiff became a non-caring person who kept to himself and could not maintain employment. She had watched plaintiff deteriorate over the past 20 years to a shell of a man who is always alone, never goes anywhere, and has no friends. She sees him experience flashbacks, nightmares and suspicions against anyone and anything. She reported that plaintiff is always on the lookout for the enemy "Charlie" and she has to remind him to take a shower and to keep doctors' appointments. (Tr. 180-82, 183-85).

Ms. Kakaris completed a third-party function report dated January 28, 2007, in which she reported that plaintiff sits in the same spot all day watching TV with his dog on a leash next to him. (Tr. 147-154). Ms. Kakaris reported that plaintiff bathes every two to three days and refuses to cut his hair. She has to remind him to take a shower, feed his dog, and help with household chores. Plaintiff shops about once a month. She reported that plaintiff's grapefruit-size hernia affects his ability to lift, squat, bend, stand, sit, kneel, and climb stairs and requires him to walk with a cane. (Tr. 152). Ms. KaKaris concluded that plaintiff cannot handle stress or change and becomes upset easily.

Desarae Riley, plaintiff's great-niece, wrote a letter to the Commissioner dated November

15

13, 2006. Ms. Riley reported that plaintiff is unable to handle his daily affairs without supervision. He needs reminders to make appointments, shower, and maintain personal hygiene. She witnessed him suffering flashbacks and depression. She recalled an incident where plaintiff was watching TV and began to argue with the character by accusing him of being in league with "Charlie" and went to attack the TV. When Ms. Riley attempted to calm plaintiff, he grabbed a pencil and began to stab at her. Ms. Riley reported that the incident quickly ended and plaintiff, completely unaware of what he had done, simply sat down and asked her to make a pot of coffee. (Tr. 187-190).

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff's attorney stated at the administrative hearing that plaintiff received SSI from 1987 to 2004 because of PTSD. (Tr. 30-31). Plaintiff testified that no hearing was conducted in conjunction with the prior award of benefits. (Tr. 30). Plaintiff served in the Army from July 28, 1969 to August 30, 1972, when he received an honorable discharge. (Tr. 33). He has a VA disability rating of 30% based on PTSD. (*Id.*). He last worked in 1985 in Miami, Florida, in construction. (Tr. 34). He left that job and came back to Ohio to care for his mother, who died in 1987. (*Id.*). He did not return to work because he cared for his father for the next 10 to 15 years until his father's death in 2002 or 2003. (*Id.*). At the time of the administrative hearing, he lived with his niece and her fiancée. (Tr. 31).

Plaintiff testified that he is unable to work due to constant intrusive thoughts of the Vietnam War. (Tr. 35). He testified that he is constantly stressed because of the war and it is always on his mind. (Tr. 41). Each morning when he wakes up he is ready to go searching for the enemy. (*Id.*). All day he constantly thinks of the war. (Tr. 35, 41-42). Certain smells,

16

sounds and sights can cause him to have flashbacks and to fear for his life. (Tr. 40). At night, recurrent nightmares of the war disrupt his sleep. (Tr. 43). His flashbacks occur at night four times a week and last for 15 to 20 minutes. (Tr. 49). Flashbacks also occur during the day three times a week and last for five to ten minutes. (*Id.*).

Plaintiff testified that he suffers from depression, inability to concentrate, and lack of sleep. (Tr. 35, 40, 43). He gets only three to four hours of sleep a night. (Tr. 35). He also suffers from paranoia and is constantly checking the windows and doors. (*Id.*). He stated that he had rarely been out of the house in over two years. (Tr. 44). Other than his niece, plaintiff has no personal relationships. (Tr. 41). His niece does all the shopping, cooking, and cleaning and plaintiff does not perform any household chores or do laundry. (Tr. 44-45).

Plaintiff testified he suffers from a hernia and from hepatitis C, which makes him sluggish and nauseous at times. (Tr. 37). At the time of the hearing, he was taking no medication for his physical condition. (*Id.*). The hernia affects his ability to walk any distance and causes severe swelling and pain in his testicles. (Tr. 36). He uses a cane when he walks in public, but he does not use it at home. (Tr. 38). The heaviest thing he can lift is his dog, which weighs about 30 pounds. (*Id.*). Plaintiff estimated that he is able to stand for only a couple of minutes due to his hernia. (Tr. 39). He estimated he can walk for three minutes before he needs to stop and lean on his cane. (*Id.*).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE to consider an individual plaintiff's age with plaintiff's education and the RFC to perform medium exertional work with the limitations that he can frequently climb ladders, ropes, or scaffolds; frequently climb ramps or stairs; and frequently balance,

17

stoop, crouch, kneel, and crawl. (Tr. 52). He is also limited to an occupation which would allow him to wear a truss while performing exertional work. (*Id.*). He is limited to simple, routine, and repetitive tasks. He requires a low stress environment free of fast-paced production requirements, involving only simple, work-related decisions and few, if any, workplace changes. His work must be limited to only occasional interaction with the public and coworkers and he must be in an alcohol and drug-free environment. (Tr. 54). The VE testified that such an individual could perform work as a janitor (Tr. 52); material handler, with 4,079 local positions and 535,617 national positions (Tr. 55); production helper, with 99 local positions and 1,104 national positions; and machine operator, with 152 local positions and 13,702 national positions. (*Id.*). The VE further testified that if the work were limited to isolated work with only occasional supervision, the number of such positions plaintiff could perform would be reduced by two-thirds. (*Id.*). The VE testified that with only occasional supervision, plaintiff could perform the position of inspector/sorter, with 179 jobs locally and 24,963 nationally, although the number of available positions would need to be reduced by two-thirds to accommodate generally being isolated with only occasional supervision. (Tr. 56).

When questioned by plaintiff's counsel, the VE testified that assuming the accuracy of the GAF ratings assigned by Dr. Berg and the VA medical sources, *i.e.* 40 and 50, respectively, plaintiff would not be able to maintain full-time employment. (Tr. 58).

## OPINION

Plaintiff assigns four errors in this case: (1) the ALJ erred in determining that plaintiff did not meet Listing 12.04A(1) and B; (2) the ALJ's RFC decision was not supported by substantial evidence, (3) the ALJ did not consider the third-party statements; and (4) the ALJ failed to make

a finding that plaintiff showed medical improvement pursuant to *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997).

## I. The ALJ did not err by failing to apply the *Drummond* medical improvement standard.

The Court will address plaintiff's fourth assignment of error initially since it raises the issue of the proper standard of review. Plaintiff contends the ALJ failed to find "medical improvement" before denying benefits in violation of the rule in *Drummond*, 126 F.3d 837. As a threshold matter, the Court must determine whether the Sixth Circuit's decision in *Drummond* applies in this case.

In *Drummond*, the Sixth Circuit held that Social Security claimants and the Commissioner are barred from re-litigating issues that have previously been determined at the administrative level. *Drummond,* 126 F.3d at 842. *See also* 42 U.S.C. § 405(h) ("The findings and decision of the Commissioner of Social Security after a hearing shall be binding on all individuals who were parties to such hearing."). *Drummond* mandates that absent evidence a claimant's condition has improved, findings issued by an ALJ as part of a prior disability determination are binding on an ALJ in a subsequent proceeding. *Drummond*, 126 F.3d at 841 (citing 20 C.F.R. § 404.905). The Commissioner bears the burden to prove changed circumstances so as to escape being bound by the principles of res judicata. *Id*. at 843.

Following the decision in *Drummond*, the Commissioner issued an Acquiescence Ruling mandating that ALJs in Ohio (and other states within the Sixth Circuit) follow *Drummond* by applying res judicata to a prior assessment of a claimant's RFC and other prior findings made as part of a sequential evaluation. The Acquiescence Ruling explains:

> When adjudicating a subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as the prior claim, adjudicators must adopt
> such a finding from the final decision by an ALJ or the Appeals Council on the
> prior claim in determining whether the claimant is disabled with respect to the
> unadjudicated period unless there is new and material evidence relating to such a
> finding or there has been a change in the law. . . .

AR 98-4(6), 1998 WL 283902, at *3 (June 1, 1998).

Here, the parties dispute whether *Drummond* applies under the circumstances this case

presents. Plaintiff argues that *Drummond* applies. (Doc. 11 at 12-13). Plaintiff states that he

received SSI for nearly 20 years until he was incarcerated in 2005; his benefits ceased at that

time; and when he was released from prison, he re-filed for benefits. Plaintiff argues that under

this scenario, it was incumbent upon the Social Security Administration to attempt to locate his

prior file and prove based on a comparison of that file and the current record that his condition

medically improved between the time he began receiving SSI and the date his benefits ceased.

(*Id.*, citing *Drummond*, 126 F.3d at 841: a subsequent ALJ is bound by the findings of a previous

ALJ absent evidence of improvement in the claimant's condition). Plaintiff argues that this

matter must be remanded because the ALJ did not make a finding as to whether there had been

any improvement in his condition.

The Commissioner disagrees with plaintiff's analysis and argues that *Drummond* does not

apply here. According to the Commissioner, *Drummond* holds that principles of res judicata

apply only where the SSA has issued a final decision containing a finding of a claimant's RFC

following a hearing on a prior disability claim, whereas plaintiff testified that his prior

application was approved without an administrative hearing. (Doc. 16 at 3, citing Tr. 30).

The Court finds that *Drummond* is not applicable under the circumstances presented here

because this case does not involve the situation *Drummond* addressed. This case differs from *Drummond* in that the Social Security Administration did not exercise its discretion here to reexamine plaintiff's entitlement to benefits. *See Drummond*, 126 F.3d at 842. To the contrary, it is undisputed that plaintiff's benefits were terminated as a result of his criminal conviction and incarceration, thus requiring plaintiff to submit a new application covering a new period of eligibility which began following his release from prison. (*See* Doc. 11 at 12).[4] Courts have held that under such circumstances, it is proper for the ALJ to apply the five-step sequential evaluation analysis for a new application rather than the medical improvement standard applicable to a continuing disability review under 20 C.F.R. § 416.994. *See Messer v. Astrue*, No. 09-342, 2010 WL 4791956 (E.D. Ky. Nov. 18, 2010) (and cases cited therein).

The District Court in *Messer* addressed the issue of whether *Drummond* applied where the claimant's benefits had been terminated as a result of his incarceration. In *Messer*, a Disability Hearing Officer (DHO) had issued a decision in 1997 finding the plaintiff was entitled to benefits. *Id.*, at *1. The benefits were subsequently terminated when the plaintiff was incarcerated. Plaintiff then filed two additional applications for benefits, both of which were denied following ALJ hearings. The District Court rejected the plaintiff's argument that the ALJ who issued the unfavorable decision on his third application was required to accept the DHO's initial favorable determination rather than the unfavorable determination made by the first ALJ in 2005. The District Court determined that *Drummond* was totally inapplicable to the DHO's 1997

---

[4]Under the Social Security statutory and regulatory scheme, plaintiff was ineligible to receive Social Security benefits during his incarceration. *See* 42 U.S.C. § 1382(e)(1)(A) (excluding from eligibility for SSI an inmate of a public institution.); 20 C.F.R. § 416.211 (same). *See also Schweiker v. Wilson*, 450 U.S. 221, 224 (1981).

finding given the procedural history of the case: plaintiff's benefits had been terminated as a result of his incarceration; he was therefore not entitled to a resumption of benefits; and he was required to submit a new application for benefits subject to the five-step sequential evaluation process. *Id.*, at *5 (citing *Brennan v. Astrue*, 501 F. Supp.2d 1303, 1309 (D. Kan. 2007) (once claimant's benefits were terminated upon incarceration, she was required to file a new application and the five-step sequential evaluation applied anew); *Hill v. Astrue*, No. 09-446-CL, 2010 WL 3361448, at *4 (D. Or. Aug. 19, 2010) (prior favorable disability determination did not inform subsequent eligibility for benefits following termination of benefits during prolonged period of incarceration); *Zavilla v. Astrue*, No. 09-133, 2009 WL 3364853, at *17 (W.D. Pa. Oct. 16, 2009) (after termination of benefits, claimant is required to file new application which is evaluated under five-step sequential analysis). Conversely, the ALJ who issued the unfavorable decision on the third application was bound by the prior ALJ's unfavorable determination that plaintiff did not meet the Listings given that the decision was a final and binding decision with respect to the adjudicated period; plaintiff chose not to seek judicial review; and the determination was a required step in the sequential evaluation process. *Id.*, at *5.

Similarly, in this case, plaintiff's incarceration rendered him ineligible for benefits and necessitated the filing of a new application to be evaluated under the five-step sequential analysis. Neither plaintiff nor the Commissioner are seeking to relitigate issues which have previously been determined at a step in that process. The prior disability determination is of no consequence, and *Drummond's* holding therefore has no applicability here. The ALJ was not bound by the SSA's previous disability finding and the ALJ properly applied the five-step sequential analysis for a new application. Plaintiff's fourth assignment of error is without merit.

**II. The ALJ did not err by finding plaintiff does not meet Listing 12.04**.

Plaintiff claims that the ALJ erred by finding his mental impairment does not satisfy

Listing 12.04A(1) and B. Listing 12.04 provides, in pertinent part, as follows:

> Affective disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following:
>
> a. Anhedonia or pervasive loss of interest in almost all activities; or
> b. Appetite disturbance with change in weight; or
> c. Sleep disturbance; or
> d. Psychomotor agitation or retardation; or
> e. Decreased energy; or
> f. Feelings of guilt or worthlessness; or
> g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or
> i. Hallucinations, delusions, or paranoid thinking[.]

To satisfy the "paragraph B" criteria, the mental impairments must result in at least two

of the following: marked restriction of activities of daily living; marked difficulties in

maintaining social functioning; marked difficulties in maintaining concentration, persistence, or

pace; or repeated episodes of decompensation, each of extended duration. A marked limitation

means more than moderate but less than extreme. Repeated episodes of decompensation, each of

extended duration, means three episodes within 1 year, or an average of once every 4 months,

each lasting for at least 2 weeks.

The ALJ determined that plaintiff's mental impairments, considered singly and in

combination, do not meet or medically equal the criteria of Listing 12.04B because they do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration. The ALJ found that plaintiff has mild limitations in activities of daily living; mild limitations in social functioning; moderate limitations in concentration, persistence, or pace; and has experienced no episodes of decompensation of extended duration. (Tr. 18).

Because the parties do not dispute that plaintiff meets the requirements of Part A of Listing 12.04, the only issue before the Court is whether the ALJ's finding that plaintiff does not meet or equal Part B of Listing 12.04 is supported by substantial evidence.

Plaintiff contends the ALJ erred in his Listings determination because the evidence from the consultative examining psychologist, Dr. Berg, and the VA medical providers shows his psychological impairments meet the requirements of Part B of Listing 12.04. Dr. Berg diagnosed PTSD and depression and assigned plaintiff a GAF score of 50, which indicated a "serious" impairment in social and occupational functioning. (Doc. 11 at 9, citing Tr. 259-266). The VA medical providers diagnosed plaintiff with PTSD and assigned GAF scores below 50. (*Id.*, citing Tr. 289: PTSD diagnosis noted in connection with hernia care; Tr. 309: PTSD diagnosis and GAF score of 50 assigned by one-time examining psychiatric resident Dr. Strawn; Tr. 320: PTSD diagnosis and GAF score of 40 assigned during mental health intake screening by Karen Ross, R.N.; Tr. 369: PTSD diagnosis noted as part of hernia evaluation; Tr 389-390: PTSD noted to be in partial remission and GAF score of 50 assigned by one-time examining psychiatrist Dr. Greenwald). Plaintiff asserts Dr. Berg's report is consistent with those of the VA doctors and that the ALJ erred by failing to explain why he rejected these medical opinions in denying

benefits under Listing 12.04.

As an initial matter, the Court notes that plaintiff overstates the significance of the GAF scores assigned by Dr. Berg and the VA medical sources. Although the GAF scores of 50 and 40 assigned by Dr. Berg and the VA providers indicate a "serious" impairment in social and occupational functioning, the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Commissioner of Social Security*, 211 F. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart*, 133 F. App'x 684, 691-92 n. 5 (11th Cir. 2005)) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). *See also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[A]ccording to the [Diagnostic and Statistical Manual's] explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning. . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.") (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). Where other substantial evidence supports an ALJ's conclusion that a claimant is not disabled, the Court may not reverse the denial of benefits even where the GAF scores are in the ranges assigned by Dr. Berg and the VA medical providers. *Kornecky*, 167 F. App'x at 511.

In this case, the ALJ gave legitimate reasons for discounting the validity of the GAF scores assigned by Dr. Berg and the VA providers and these reasons find substantial support in the record. The ALJ reasonably discounted the GAF scores assigned by these medical sources because (1) plaintiff had been diagnosed with substance abuse dependence, which is not a

legitimate basis for disability benefits, and (2) plaintiff had not been forthcoming about the extent of his substance abuse and relative lack of symptoms, so that the providers who assigned the scores did not have an accurate picture of plaintiff's functioning. (Tr. 20). In support of his findings, the ALJ noted a number of discrepancies in the record concerning plaintiff's reported substance abuse, his symptoms or lack thereof, and the extent of his daily activities. (Tr. 20-22). As explained in more detail below, these findings are substantially supported by the record evidence and provide a reasonable basis for not crediting plaintiff's GAF scores.

Plaintiff also contends that Dr. Berg's report "is consistent" with a finding that his impairment meets Part B of Listing 12.04 because Dr. Berg imposed extreme and marked limitations "in two different occupational areas." (Doc. 11 at 9, citing Tr. 259-266).[5] The ALJ rejected Dr. Berg's opinion that plaintiff was markedly to extremely limited in his ability to sustain his level of activity and cope with job stress because that opinion was inconsistent with plaintiff's reported lack of symptoms, invalid VA test results, secondary gain issues, refusal to obtain treatment except for purposes of securing disability benefits, and activity level. (Tr. 21-22). The ALJ also noted that plaintiff had at times exaggerated his symptoms, while at other times he denied the existence of any symptoms. The ALJ further cited to plaintiff's failure to honestly report the extent of his substance abuse to his medical providers. (Tr. 20-22). The ALJ's decision in this regard is substantially supported by the record.

As the ALJ reasonably found, plaintiff often denied or exaggerated his symptoms. Jail

---

[5]Part B of Listing 12.04 requires marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Yet, Dr. Berg did not offer an opinion on the extent of plaintiff's limitations, if any, in the four specific categories of Part B of Listing 12.04 and it is not readily apparent how Dr. Berg's findings satisfy the particular criteria of the Listing 12.04B.

records indicate that when plaintiff was incarcerated in December 2005, he denied a history of mental health treatment, suicide attempts or suicidal ideation, emotionality, or hallucinations, and his behavior and affect appeared within normal limits. (Tr. 227, 242-244, 247). Plaintiff did not report severe mental health issues, including nightmares which affected his sleep and suspicion of the government, until he saw Dr. Berg in July 2006. (Tr. 259-265). In September 2007, the VA reported that the results of a PTSD screen were negative after plaintiff denied ever having had an experience that was so frightening, horrible or upsetting that it caused him to experience nightmares, distracting or intrusive thoughts, or other symptoms of PTSD within the last month. (Tr. 371). At the VA on September 5, 2008, plaintiff denied that he had any difficulties with activities of daily living. (Tr. 379). The evaluating psychologist, Dr. Greenwald, diagnosed plaintiff with PTSD but characterized the level of symptoms as "low" and noted there were factors that reduced the validity of plaintiff's reported symptoms. (Tr. 387-388, 391). Dr. Greenwald stated that although plaintiff scored a 53 on the Posttraumatic Stress Disorder Checklist (PCL), which indicated that he was "endorsing clinically significant levels of symptoms associated with PTSD," plaintiff had denied the presence or intensity of many of the items which he endorsed on the test. (Tr. 391). Moreover, plaintiff's inconsistent responses during testing led Dr. Greenwald to question the accuracy of the results of the Beck Depression Inventory-II (BDI-II):

> The patient's score of 40 on the BDI-II suggests he is experiencing a severe level of depression at this time. However, it is noteworthy that he denied having many of [the] problems that he endorsed on the test, when asked about them during the clinical interview. Some of the discrepancies can be attributed to physical limitations, as opposed to actual disinterest, but others are contradictory (e.g., he denied feeling fatigued, having a loss of interest, having concentration problems, etc., when specifically asked about these during the clinical interview). It would

therefore appear that the test results reflect a spurious elevation.

(Tr. 390). Dr. Greenwald determined that plaintiff had dysthymia and chronic symptoms of depression, including sadness, some isolation and sleep disturbance, but that he did not meet the criteria for a major depressive disorder. (Tr. 386). Plaintiff's inconsistent reports over the relevant time period and questionable test results support the ALJ's decision that plaintiff was not as limited as Dr. Berg assessed.

Substantial evidence also supports the ALJ's finding that plaintiff has a history of seeking treatment only for the purpose of securing disability benefits. Although plaintiff reported serious mental health issues to Dr. Berg in July 2006, plaintiff had declined the offer of a mental health consultation when he was incarcerated in December 2005. (Tr. 218). Plaintiff also declined substance abuse treatment and mental health treatment at the VA in July 2007 because he was "trying to get his social security started." (Tr. 364-365). In addition, Dr. Somoza of the VA reported on November 19, 2007, that plaintiff had not taken care of any of the appointments she had set up for him for his hernia and that he had come in "only looking for pain [medicine]. He says he's working on SSI." (Tr. 366). Moreover, the notes from plaintiff's September 5, 2008 VA visit quote plaintiff as stating he had come to the VA because he needed to get further treatment for his PTSD and to be "'reverified for [his] PTSD' to get SSI started again." (Tr. 378). Evaluating psychologist Dr. Greenwald noted at that time plaintiff was seeking to have SSI reinstated and had candidly reported that active treatment for PTSD would facilitate that, which made plaintiff's motivation for treatment suspect. (Tr. 388). Furthermore, the record shows that plaintiff has not taken medication on a sustained basis for his PTSD. Plaintiff reported to Dr. Berg that he had taken Zoloft for a few days and he had taken Trazadone to help him sleep, but

28

he discontinued both medications because they allegedly made him ill. (Tr. 261). The ALJ reasonably considered these factors in assessing the weight to accord Dr. Berg's opinion and the ALJ's conclusion that plaintiff was not more than moderately impaired in his ability to function in any particular occupational area set forth in Part B of Listing 12.04 is substantially supported by the record.

Finally, plaintiff argues the ALJ should not have relied on the report of the non-examining state agency psychologist, Dr. Benninger, because the psychologist never examined plaintiff; he based his findings primarily on Dr. Berg's report, which showed that plaintiff's impairment is of Listing-level severity; and he did not have the opportunity to see most of the medical records, which were filed after his report was completed. (Doc. 11 at 9, citing Tr. 259-266). The Court disagrees.

Dr. Benninger was the only mental health professional to render an opinion as to plaintiff's degree of limitation in each category under Part B of the Listing. Dr. Benninger opined that plaintiff has mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 340). Dr. Benninger explained the bases for his findings in his report. (Tr. 346). The ALJ in turn fully explained his reasons for relying on Dr. Benninger's opinion and for rejecting Dr. Berg's more extreme limitations, citing ample evidence in the record to support his decision, including evidence and medical records that post-dated Dr. Benninger's report. (Tr. 20-22). Because the ALJ thoroughly reviewed the medical records which were issued following Dr. Benninger's report and plaintiff does not allege that his condition materially changed following the date of the

29

report, Dr. Benninger's inability to view medical records which post-date his report is not a valid basis for rejecting the report. Dr. Benninger's report is therefore substantial evidence supporting the ALJ's decision that plaintiff's mental impairments do not meet the Listings.

The ALJ's decision reflects a thorough review of the record and substantial evidence supports his conclusion that plaintiff's mental impairment does not satisfy Listing 12.04. Accordingly, the ALJ's finding that plaintiff's psychological impairments do not meet the Listings should be upheld.

### III. The ALJ did not err in rendering the RFC determination.

Plaintiff's second assignment of error asserts that the ALJ erred in his RFC determination by (1) failing to credit the GAF scores and assessments of the treating and examining doctors, and (2) placing great weight on the opinion of the non-examining state agency provider, Dr. Benninger. (Doc. 11 at 9-11). Plaintiff contends that the "treating" doctors at the VA and Dr. Berg assigned him GAF scores of less than 50 and Dr. Berg imposed moderate to extreme limitations, which the VE testified were disabling assessments. (*Id*. at 10, citing Tr. 58, 263, 320). Plaintiff alleges that their ratings were supported by objective psychological evidence, which included signs of PTSD (recurrent flashbacks, nightmares, hyperarousal, and psychomotor retardation); severe depression; cognitive dysfunction; tangential thinking; and pressured speech. (*Id*., citing Tr. 259, 308-309, 380, 386-391). Plaintiff argues that the ALJ erred by giving great weight to the RFC ratings of Dr. Benninger because Dr. Benninger issued his report three years before the hearing and before much of the medical evidence was filed; the ratings were made without the benefit of a face-to-face meeting with plaintiff; and the ratings contradict the treating and examining physicians' ratings and the third-party statements. (*Id*. at 11, citing Tr. 358-375;

376-397).

As plaintiff essentially reiterates the same arguments he made in support of his Listings assignment of error, the Court's reasoning for upholding the ALJ's Listings determination is equally applicable to its conclusion that the ALJ's RFC determination is supported by substantial evidence. As previously explained, the ALJ was not bound to accept the GAF scores or opinions of the examining providers over the opinion of the state agency psychologist, Dr. Benninger. The ALJ reasonably determined that plaintiff's reported lack of symptoms, invalid test results, secondary gain issues, refusal to obtain treatment except for purposes of securing disability benefits, and activity level are inconsistent with the GAF scores and opinions of Dr. Berg and the VA medical sources. (Tr. 21-22). Therefore, for the reasons stated in connection with the previous assignment of error, substantial evidence supports the ALJ's decision to discount the GAF scores of Dr. Berg and the VA providers, as well as the extreme limitations imposed by Dr. Berg, and to instead rely on Dr. Benninger's opinion on plaintiff's functional capacity in assessing plaintiff's RFC.

In addition, plaintiff has not shown that the ALJ failed to give proper weight to the opinions of his "treating" providers because there is no evidence that plaintiff received ongoing care from an individual who can be categorized as a treating provider. *See Blakley v. Commissioner of Social Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (citing 20 C.F.R. § 404.1502) ("A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation [that is] typical for the [treated condition(s)].").  Plaintiff saw different mental health care providers at the VA at various

times, but not as part of an ongoing course of treatment. Psychiatric resident Dr. Strawn completed only one evaluation of plaintiff on October 13, 2005 (Tr. 308-09); R.N. Karen Ross completed one mental health intake summary on October 6, 2005 (Tr. 317-320); and psychiatrist Dr. Greenwald completed one intake evaluation in September 2008. (Tr. 378-391). There is no evidence of an ongoing treatment relationship to qualify any VA medical source as a "treating" provider. Thus, the VA providers do not qualify as treating sources under the Social Security regulations and their opinions are not entitled to the weight afforded the opinions of a treating provider. *See Wilson*, 378 F.3d at 547.

Although the evidence documents plaintiff's severe mental impairments, the ALJ's determination that plaintiff's impairments do not preclude him from performing a limited range of medium work is supported by substantial evidence. *See White v. Commissioner of Social Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) (holding that an ALJ's finding that a medical opinion conflicts with other evidence in the record is a sufficient reason to discount the opinion); 20 C.F.R. § 404.1527(c)(2) ("If any . . . medical opinion(s) is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence . . . ."). While the record could conceivably support a contrary finding, the Social Security Act does not permit the reviewing court to resolve conflicts in the evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's review is limited to determining whether substantial evidence supports the ALJ's conclusion. Here, the ALJ cited ample evidence to support his conclusion that notwithstanding plaintiff's psychological impairments, he is capable of engaging in substantial gainful employment. The ALJ's finding should not be disturbed.

#### IV. The ALJ did not fail to consider the third-party statements.

Plaintiff claims that the ALJ erred by failing to consider third-party statements provided

by plaintiff's niece and great-niece in violation of 20 C.F.R. § 404.1513(e)(2) and Social Security

Ruling 96-8p. (Doc. 11 at 11-12, citing *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)).

Title 20 C.F.R. § 404.1513 provides that the Commissioner *may* consider lay testimony

evidence:

> (d) Other sources. In addition to evidence from the acceptable medical sources
> listed in paragraph (a) of this section, we may also use evidence from other
> sources to show the severity of your impairment(s) and how it affects your ability
> to work. Other sources include, but are not limited to--
> . . . .
> (4) Other non-medical sources (for example, spouses, parents and other caregivers,
> siblings, other relatives, friends, neighbors, and clergy).

Social Security Ruling 96-8p imposes on the ALJ the requirement to include a narrative

discussion in the RFC assessment of how the evidence supports each conclusion; discuss the

individual's ability to perform sustained work activities on a regular and continuing basis; and

explain how any material inconsistencies or ambiguities in the evidence were considered and

resolved.

The assessment of the credibility of lay witnesses, as well as the weight to attribute to

their testimony, is peculiarly within the judgment of the ALJ. The testimony of a lay witness

"must be given 'perceptible weight' [only] where it is supported by medical evidence." *Allison

v. SSA*, No. 96-3261, 1997 WL 103369, at *3 (6th Cir. 1997) (citing *Lashley v. HHS*, 708 F.2d

1048, 1054 (6th Cir. 1983) ("Perceptible weight must be given to lay testimony where . . . it is

fully supported by the reports of the treating physicians."). *See also Simons v. Barnhart*, 114 F.

App'x 727, 733 (6th Cir. 2004).

Here, the ALJ fulfilled his obligations under the Social Security regulations and rulings. The ALJ acknowledged the third-party statements from plaintiff's niece and great niece and stated that he considered them. (Tr. 19). The ALJ was not required to give "perceptible weight" to the statements as they were not fully supported by the medical evidence of record. Plaintiff's third assignment of error is not well-taken and should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be AFFIRMED and this case be dismissed from the docket of this Court.

Date: 11/29/2011

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARCUS ROARK,
Plaintiff

Case No. 1:10-cv-739
Barrett, J.
Litkovitz, M.J.

vs

COMMISSIONER OF
SOCIAL SECURITY,
Defendant

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within **FOURTEEN DAYS** after being served with this Report and Recommendation ("R&R"). That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **FOURTEEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).